JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Anthony Delfino, Ronald Godlewski, Stanley Saffron, Millie Godlewski and Lynn Muskey

**(b)** County of Residence of First Listed Plaintiff **Lackawanna**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John G. Dean, Joseph J. Joyce, III and Lawrence J. Moran, Jr., Elliott Greenleaf & Dean, 201 Penn Avenue, Ste 202, Scranton, PA 18503, (570) 346-7569

## DEFENDANTS

Ameritas Life Insurance Corporation and Ameritas Investment Corporation

County of Residence of First Listed Defendant **Nebraska (Lancaster Cnty)**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
           THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | **PERSONAL INJURY** | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 310 Airplane   ☐ 365 Personal Injury - | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 315 Airplane Product Liability   Product Liability | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander   Pharmaceutical | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Personal Injury | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability   Product Liability | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine   ☐ 368 Asbestos Personal | | | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product   Injury Product | | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability   Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle   **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 370 Other Fraud | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability   ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   ☐ 380 Other Personal | Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury   Property Damage | ☐ 740 Railway Labor Act | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury -   ☐ 385 Property Damage | ☐ 751 Family and Medical | | Act |
| | Medical Malpractice   Product Liability | Leave Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement | or Defendant) | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | Income Security Act | ☐ 871 IRS—Third Party | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | 26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/   Sentence | | | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment   **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other   ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§78a
Brief description of cause:
Securities fraud committed when Defendants' agent sold securities accounts to investors, then stole the funds

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P     **DEMAND $**     CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
11/14/2014

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANTHONY DELFINO,                 :
507 E. Grant Street              :
Olyphant, PA 18447,              :
                                 :
RONALD GODLEWSKI,                :
225 Church Street                :
Old Forge, PA, 18518,            :     CIVIL ACTION - LAW
                                 :
STANLEY SAFFRON,                 :
613 Sunset Drive                 :     No. _____
Bloomsburg, PA 17815,            :
                                 :
MILLIE GODLEWSKI                 :     Jury Trial Demanded
220 Railroad Court               :
Taylor, PA 18517,                :
                                 :
and                              :
                                 :
LYNN MUSKEY                      :
901 Scott Street                 :
Dickson City, PA 18519,          :
                                 :
                Plaintiffs,      :
        v.                       :
                                 :
AMERITAS LIFE INSURANCE          :
CORPORATION,                     :
5900 O Street                    :
P.O. Box 5507                    :
Lincoln, NE 68505,               :
                                 :
and                              :
                                 :
AMERITAS INVESTMENT              :
CORPORATION,                     :
5900 O Street                    :
Lincoln, NE 68505,               :
                                 :
                Defendants.      :

## COMPLAINT

This action is brought by Anthony Delfino ("Mr. Delfino), Ronald Godlewski ("Mr. Godlewski"), Stanley Saffron ("Mr. Saffron"), Millie Godlewski ("Mrs. Godlewski") and Lynn Muskey ("Mrs. Muskey")(collectively "Plaintiffs") seeking monetary relief from and against Ameritas Life Insurance Corporation and Ameritas Investment Corporation (collectively "Defendant"). Plaintiffs are ordinary, hard-working, blue-collar citizens who lost sentimental death benefits money and had their retirement accounts plundered as a consequence of a Ponzi scheme and related financial fraud committed by Defendant's authorized representative, Jason Muskey ("Muskey").

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as the matter arises under the Constitution, laws, or treaties of the United States.

2. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity of citizenship between Plaintiffs and Defendant and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

3. This Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

4.     This Court has personal jurisdiction over Defendant pursuant to U.S. Const. amend. XIV, § 1 and 42 Pa. C.S.A. §5322(a).

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as transactions or occurrences giving rise to the claims took place in this district, and parties reside and conduct business within the jurisdiction of this Court.

## PARTIES

6.     Plaintiffs fully incorporate the preceding paragraphs as if same were set forth here at length.

7.     Plaintiff Anthony Delfino is a Pennsylvania citizen residing at 507 East Grant Street, Olyphant, Pennsylvania 18447.

8.     Plaintiff Ronald Godlewski is a Pennsylvania citizen residing at 225 Church Street, Old Forge, Pennsylvania 18518.

9.     Plaintiff Stanley Saffron is a Pennsylvania citizen residing at 613 Sunset Drive, Bloomsburg, Pennsylvania 17815.

10.    Plaintiff Millie Godlewski is a Pennsylvania citizen residing at 220 Railroad Court, Taylor, PA 18517.

11.    Plaintiff Lynn Muskey is a Pennsylvania citizen residing at 901 Scott Street, Dickson City, Pennsylvania 18519.

12.    Defendant Ameritas Life Insurance Corporation[1] is believed to be a lawfully organized and dually registered corporation, and is capable of receiving service of process at its principal place of business: 5900 O Street, P.O. Box 5507, Lincoln, Nebraska 68505.   Defendant is an investment adviser as the term is defined in 15 U.S.C. § 80b-2(11).

## BACKGROUND FACTS

13.    Plaintiffs fully incorporate the preceding paragraphs as if same were set forth here at length.

14.    Plaintiffs are victims of a Ponzi scheme and related financial fraud perpetrated by Muskey, while Muskey was acting as a registered and authorized agent of Defendant.

15.    Defendant is a financial services enterprise, specifically a privately owned Broker-Dealer with a network of over 1500 registered representatives and financial advisors nationwide.

16.    Muskey was one of Defendant's registered representatives and financial advisors, at all times relevant to the causes of action contained herein.

17.    Additionally, Defendant, through subsidiary and/or affiliate companies, offers financial products for sale to the general public.

---

[1]    Upon Plaintiffs' information and belief, Defendant also trades as Ameritas Investment Corporation.   Defendant is also the parent or affiliate company of Union Central Life Insurance Company.

18.     Defendant was Muskey's state and federally mandated Broker-Dealer in Pennsylvania, at all times relevant to the causes of action contained herein.

19.     Plaintiffs are not sophisticated investors, but rather they are hard-working, blue-collar individuals who, during the courses of their careers and lifetimes, received pension, retirement, or death benefits money that was intended to be a significant source of future income and future financial stability for Plaintiffs.

20.     Muskey separately targeted each Plaintiff, held himself out as an agent of Defendant, and specifically pitched each Plaintiff on investment opportunities through Defendant and other providers of financial products.

21.     Muskey typically explained to Plaintiffs that their purchase of an annuity and/or a term or whole life insurance policy, inter alia, would be a conservative investment that would guarantee a predictably steady and climbing rate of return.

22.     Muskey would further explain to Plaintiffs that they were able to fund new investments in Defendant and other providers of financial products by cashing out or "rolling over" their existing 401K funds, with no withdrawal penalties accruing to Plaintiffs.

23.     Plaintiffs separately agreed to cash out and/or roll over their existing retirement accounts to fund the new investment opportunties that Muskey described at Defendant and other providers of financial products.

5

24.     Unbeknownst to Plaintiffs when they made their investments, Muskey, in his capacity as Defendant's agent, was involved in a Ponzi scheme and he was systematically stealing money from his clients.

25.     To accomplish his fraud, Muskey would (1) encourage clients/victims to issue checks directly to various financial institutions but never remit the checks to said financial institutions, (2) issue materially false statements or omit to state materially important facts and employ deceptive conduct to deceive clients/victims into executing withdrawal forms for various financial institutions, or (3) forge client/victim withdrawal forms to various financial institutions.

26.     To further assist his fraud, Muskey would engineer and disseminate to clients/victims fake statements concerning their purported investments products.

27.     To further assist his fraud, Muskey would fabricate phony "rollover" letters and issue same, on behalf of his clients/victims, to the Internal Revenue Service (IRS).

28.     Muskey failed to inform Plaintiffs that he was stealing or otherwise mismanaging their money.

29.     To the contrary, Muskey routinely informed Plaintiffs that their investments were secure and steadily growing.

30.     Muskey was Defendant's agent, using Defendant's resources, reputation and facilities to accomplish his fraud.

31.     Defendant was Muskey's "broker-dealer" in Pennsylvania.

32.    Defendant profited and otherwise benefited from Muskey's fraud, as Muskey sold many of Defendant's financial products to his victims.

33.    Muskey and Defendant were jointly compensated for Muskey's client sales by way of split commissions and fees.

34.    Muskey described Defendant and Defendant's financial products as safe, predictable, and conservative investment opportunities for Plaintiffs.

35.    Upon information and belief, portions of the money Muskey plundered from Plaintiffs and others were used to purchase Defendant's financial products and to otherwise promote and advance Defendant and Defendant's interests.

36.    Muskey had apparent authority to act and speak for Defendant.

37.    Muskey's misconduct occurred during the course of his agency relationship with Defendant.

38.    Defendant ignored countless "red flags" that served as warning signals that a fraud was afoot.  Specifically, Defendant failed to take action in those instance where Muskey opened investment accounts with Defendant but neglected to deliver his clients' funds to those accounts.  Specifically, Defendant ignored instances of policies lapsing for non-payment of premiums.  Specifically, Defendant ignored an uncommon amount of withdrawal and/or cash surrender requests that Muskey was making, purportedly on his clients' behalf.  Specifically, Defendant ignored Muskey's lavish lifestyle and the plain reality that he was living

7

beyond his means, and far in excess of what Muskey's income would allow. Defendant never made inquiry of Muskey concerning any of these and other "red flags."

39.    Defendant failed to conduct even minimal due diligence as to Muskey's operations and assets.

40.    Defendant failed to audit or inquire about the investment advice and financial products Muskey was offering to Plaintiffs and others.

41.    All of Plaintiffs' investments were made through Muskey and, thus, through Defendant's offices and its personnel.

42.    In making their investments, Plaintiffs believed Defendant was a sponsor, supervisor, affiliate or facilitator of each investment opportunity.

43.    Each Plaintiff received from Muskey statements appearing on Defendant's letterhead and documents bearing Defendant's corporate logo.

44.    Most of the investment opportunities Muskey offered to Plaintiffs and others were Defendant's financial products.

45.    Defendant neglected to maintain basic compliance mechanisms and procedures, such as comprehensive reviews and testing, employed throughout the investment advising industry, that are designed to identify and prevent the type of fraud and self-dealing that occurred here.

46.    Muskey's fraud would have been prevented and the harm accruing to Plaintiffs disrupted, but for Defendant's failures.

47.     Defendant's reckless or willful ignorance of and failure to disrupt Muskey's fraud constitutes an extreme departure from standards of ordinary care.

48.     The fraud at issue here occurred in the course of Muskey's agency relationship.

49.     Muskey's actions were not to the detriment of Defendant, but rather resulted in a benefit or benefits to Defendant.   Specifically, Muskey sold Defendant's financial products to his duped investors and promoted Defendant and Defendant's financial products to Plaintiffs and others.

50.     Under governing principles of fair risk-allocation, including the affordance of appropriate protection to those who transact business with investment advisers, Muskey's misconduct is imputed to Defendant and Defendant is responsible and liable for harms committed by Muskey.

## REQUIRED SPECIFICTY UNDER FED. R. CIV. P. 9(B) AND THE PRIVATE SECURITIES LITIGATION REFORM ACT ("PSLRA")

### Mr. Delfino

51.     During the fall months of 2009, Mr. Delfino encountered Muskey during a guided tour to a sporting event and the pair developed a personal relationship.

52.     During one of their many conversations, Mr. Delfino informed Muskey that when Mr. Delfino's parents died, Mr. Delfino received a $100,000.00

death benefit that Mr. Delfino intended to use toward his retirement and costs associated with his children.

53.   Muskey encouraged Mr. Delfino to invest his $100,000.00 death benefit with Muskey, and allow Muskey to help Mr. Delfino safeguard and grow his money for future benefit.

54.   Specifically, Muskey enticed Mr. Delfino to open an Individual Retirement Account ("IRA") and invest in a mutual fund offered by Franklin Templeton Investments.

55.   In or around March 22, 2010, Muskey used Mr. Delfino's death benefit money to purchase a $100,000.00 IRA product with Franklin Templeton Investments' mutual fund.

56.   Between March 22, 2010 and May 30, 2012, Mr. Delfino's investment grew (through automatically reinvested dividend payments) to around $110,000.00.

57.   In or around May of 2012, Muskey placed a telephone call to Mr. Delfino during which Muskey encouraged Mr. Delfino to move his money out the mutual fund IRA account at Franklin Templeton Investments and into an account with Defendant.

58.   Muskey described Defendant as a safer and more conservative investment opportunity for Mr. Delfino than the IRA account at Franklin Templeton Investments.

59.     During May of 2012, Mr. Delfino met with Muskey at his offices in Moosic, Pennsylvania where Mr. Delfino executed withdrawal and/or rollover documents.

60.     Muskey conveyed the withdrawal documents to Franklin Templeton Investments, and Muskey simultaneously opened an account with Defendant in Mr. Delfino's name.

61.     Muskey explained to Mr. Delfino that the new account at Defendant would be funded by the penalty-free withdrawal of nearly $110,000.00 from Franklin Templeton Investments.

62.     On May 12, 2012, incident to withdrawal documents executed by Mr. Delfino and conveyed by Muskey, Franklin Templeton Investments mailed a check to Mr. Delfino's home in the amount of $100,000.00.

63.     During the mid to late portion of the month of May 2012, Mr. Delfino received the Franklin Templeton Investments check in the amount of $100,000.00 and Mr. Delfino deposited that check into Mr. Delfino's personal checking account at Fidelity Bank.

64.     Soon thereafter, on May 31, 2012, at Muskey's urging, and purportedly to accomplish the funding of the investment account that Muskey opened with Defendant, Mr. Delfino presented Muskey with a check in the amount of $100,000.00.  The check was made payable to Muskey; it was drawn on Mr. Delfino's personal checking account at Fidelity Bank; it was an amount that fully

11

reflected the withdrawn money from Franklin Templeton Investments; and Mr. Delfino intended that the money would be used to fund an investment account at Defendant.

65.   Upon information and belief, Muskey never used Mr. Delfino's $100,000.00 to fund the account at Defendant, but instead used the money for Muskey's personal benefit.

66.   Muskey never informed Mr. Delfino that the $100,000.00 was not properly conveyed to Defendant, and, in fact, led Mr. Delfino to believe that the opposite was true.

67.   On May 30, 2012, incident to withdrawal documents executed by Mr. Delfino and conveyed by Muskey, Franklin Templeton Investments mailed a check to Mr. Delfino's home in the amount of $9,614.47.

68.   During the early portion of the month of June 2012, Mr. Delfino received the Franklin Templeton Investments check in the amount of $9,614.47 and Mr. Delfino deposited that check into Mr. Delfino's personal checking account at Fidelity Bank.

69.   Soon thereafter, on June 14, 2012, at Muskey's urging, and purportedly to further fund the investment account that Muskey opened with Defendant, Mr. Delfino presented Muskey with a check in the amount of $10,000.00.   The check was made payable to Muskey; it was drawn on Mr. Delfino's personal checking account at Fidelity Bank; it was an amount that fully

12

reflected the withdrawn money from Franklin Templeton Investments; and Mr. Delfino intended that the money would be used to fund an investment account at Defendant.

70. Upon information and belief, Muskey never used Mr. Delfino's $10,000.00 to fund the account at Defendant, but instead used the money for Muskey's personal benefit.

71. Muskey never informed Mr. Delfino that the $10,000.00 was not properly conveyed to Defendant, and, in fact, led Mr. Delfino to believe that the opposite was true.

72. Between June 14, 2012 and March 31, 2014, Muskey sent Mr. Delfino phony quarterly statements purporting to describe the condition of Mr. Delfino's investment with Defendant.

73. Mr. Delfino did not know the quarterly statements were phony when he received and viewed them.

74. The quarterly statements appeared on Defendant's letterhead, and Defendant was listed on each statement as Muskey's supervising and responsible broker/dealer.

75. From June 14, 2012 until June 2, 2014, Mr. Delfino received no indication from Defendant or others that his money had been stolen.

76. On or about June 2, 2014, Mr. Delfino received a letter from Muskey indicating that Muskey is under investigation by and cooperating with the United

13

States Secret Service, and, therefore, his office would be closing in the immediate future.

77.     That June 2, 2014 letter was Mr. Delfino's first indication that Muskey had stolen his money.

78.     Mr. Delfino later confirmed that Mr. Muskey had stolen $110,000.00 from him, by taking for his own benefit the two (2) checks Mr. Delfino placed with Muskey for investment with Defendant.

79.     No portion of Mr. Delfino's` investment has been returned to him.

## Mr. Godlewski

80.     Mr. Godlewski is the uncle of Muskey's wife and they are acquainted through that relationship.

81.     Mr. Godlewski was formerly employed as a laborer at the Tobyhanna Army Depot in Tobyhanna, Pennsylvania.

82.     As a benefit of Mr. Goldewski's employment, periodic payments were made into a 401K thrift savings account for purposes of funding Mr. Godlewski's retirement.

83.     Sometime before August 28, 2009, Muskey became Mr. Godlewski's financial and investment adviser.

84.     In or around August 28, 2009, Muskey, in his capacity as Mr. Godlewski's investment adviser, approached Mr. Godlewski and enticed him to "rollover" or otherwise transfer the money from his thrift savings account into a

fixed annuity account at Union Central Life Insurance Company, which is a subsidiary and affiliate of Defendant.

85.    Muskey promised Mr. Godlewski that his investment would flourish and be secure under Muskey's stewardship.

86.    Between August 28, 2009 and September 12, 2011, and often unbeknownst to Mr. Godlewski, Muskey requested cash withdrawals from Mr. Godlewski's fixed annuity account at Union Central Life Insurance Company.

87.    On or about November 8, 2010, Muskey executed a forged "Annuity Withdrawal or Surrender Request," purportedly on Mr. Godlewski's behalf and certainly from his account, in the amount of $50,000.00.   Union Central Life Insurance issued a check in the amount of $49,989.00, payable to Mr. Godlewski, and sent it to Muskey.

88.    Upon information and belief, Muskey forged Mr. Godlewski's signature and marked the check payable to Muskey.

89.    Upon information and belief, Muskey deposited Mr. Godlewski's $49,989.00 check into Muskey's personal bank account.

90.    Upon information and belief, Muskey ordered other, similar withdrawals and or cash surrenders from Mr. Godlewski's fixed annuity account at Union Central Life Insurance Company.

91.   Muskey failed to inform Mr. Godlewski that Muskey had taken certain sums of money from his fixed annuity account at Union Central Life Insurance Company.

92.   For years after Musley stole Mr. Godlewski's money, Muskey sent Mr. Godlewski phony quarterly statements purporting to describe the condition of Mr. Godlewski's investments.

93.   Mr. Godlewski did not know the quarterly statements were phony when he received and viewed them.

94.   The quarterly statements appeared on Defendant's letterhead, and Defendant was listed on each statement as Muskey's supervising and responsible broker/dealer.

95.   Upon information and belief, Muskey stole a total $53,500.00 from Mr. Godlewski in the form of phony withdrawals or cash surrenders from  Mr. Godlewski's fixed annuity account at Union Central Life Insurance Company.

96.   On or about June 2, 2014, Mr. Godlewski received a letter from Muskey indicating that Muskey is under investigation by and cooperating with the United States Secret Service, and, therefore, his office would be closing in the immediate future.

97.   That June 2, 2014 letter was Mr. Godlewski's first indication that Muskey had stolen his money.

98.   Mr. Godlewski later confirmed Muskey stole at least $50,000.00 from his fixed annuity account at Union Central Life Insurance Company, and Mr. Godlewski believes the total amount stolen was $53,500.00.

99.   No portion of Mr. Godlewski's stolen money has been returned to him.

### Mr. Saffron

100.   Mr. Saffron was formerly employed as a carpet installer for a locally owned carpet installation business in Bloomsburg, Pennsylvania.

101.   As a benefit of Mr. Saffron's employment, periodic payments were made into a 401K thrift savings account for purposes of funding Mr. Saffron's retirement.

102.   On or about January 20, 2009, Muskey became Mr. Saffron's financial and investment adviser and encouraged him to open an account at Union Central Life Insurance Company.

103.   Muskey urged Mr. Saffron to "rollover" or otherwise transfer approximately $35,000.00 of his 401K funds to the newly enacted  account at Union Central Life Insurance Company.

104.   Muskey promised Mr. Saffron that his investment would flourish and be secure under Muskey's stewardship.

105.   On or about April 27, 2013, Muskey executed a forged  "Annuity Withdrawal or Surrender Request," purportedly on Mr. Saffron's behalf and

certainly from his account, asking for a "full cash surrender" of Mr. Saffron's account. Union Central Life Insurance issued a check in the amount of $34,397.95, payable to Mr. Saffron and sent it to Muskey.

106. Mr. Saffron neither agreed to nor knew about this "full cash surrender" request.

107. Upon information and belief, Muskey forged Mr. Saffron's signature and marked the check payable to Muskey.

108. Upon information and belief, Muskey deposited Mr. Saffron's $34,397.95 check into Muskey's personal bank account.

109. Muskey failed to inform Mr. Saffron that Muskey had taken certain sums of money from his fixed annuity account at Union Central Life Insurance Company.

110. For years after Muskey stole Mr. Saffron's money, Muskey sent Mr. Saffron phony quarterly statements purporting to describe the condition of Mr. Saffron's investments.

111. Mr. Saffron did not know the quarterly statements were phony when he received and viewed them.

112. The quarterly statements appeared on Defendant's letterhead, and Defendant was listed on each statement as Muskey's supervising and responsible broker/dealer.

113.   On or about June 2, 2014, Mr. Saffron received a letter from Muskey indicating that Muskey is under investigation by and cooperating with the United States Secret Service, and, therefore, his office would be closing in the immediate future.

114.   That June 2, 2014 letter was Mr. Saffron's first indication that Muskey had stolen his money.

115.   Mr. Saffron later confirmed Muskey stole $34,397.95 from his fixed annuity account at Union Central Life Insurance Company.

116.   No portion of Mr. Saffron's stolen money has been returned to him.

### Mrs. Godlewski

117.   Mrs. Godlewski worked in retail sales for most of her adult life, formerly at K-Mart and more recently at Walmart.

118.   As a benefit of Mrs. Godlewski's employment, periodic payments were made into an IRA account for purposes of funding her retirement.

119.   Muskey became Mrs. Godlewski's financial and investment adviser in or around 2008.

120.   Muskey originally arranged for at least a portion of Mrs. Godlewski's IRA money to be "rolled over" or otherwise transferred to an account at Equitrust Life Insurance Company.

121.   Later, Muskey ordered a "full cash surrender" of Mrs. Godlewski's account at Equitrust Life Insurance Company.

19

122.   Muskey informed Mrs. Godlewski of the withdrawal, but explained that the proceeds would be used to fund a safer and more lucrative investment account with Union Central Life Insurance.

123.   Upon information and belief, Muskey received a check from Equitrust Life Insurance Company, payable to Mrs. Godlewski, in the amount of $29,535.25.

124.   Upon information and belief, Muskey never used said proceeds to fund Mrs. Godlewski's purported account with Union Central Life Insurance.

125.   Instead, beginning in or around 2010, Muskey began making monthly $500.00 payments to Mrs. Godlewski.

126.   Muskey paid Mrs. Godlewski directly from accounts that Muskey owned and controlled.

127.   Upon information and belief, Muskey deposited the $29,535.25 received from Equitrust Life Insurance Company into his own account and for his own benefit.

128.   For years after Muskey purportedly opened a Union Central Life Insurance account for Mrs. Godlewski, Muskey sent Mrs. Godlewski phony quarterly statements purporting to describe the condition of her investment.

129.   Mrs. Godlewski did not know the quarterly statements were phony when she received and viewed them.

130. The quarterly statements appeared on Defendant's letterhead, and Defendant was listed on each statement as Muskey's supervising and responsible broker/dealer.

131. On or about June 2, 2014, Mrs. Godlewski received a letter from Muskey indicating that Muskey is under investigation by and cooperating with the United States Secret Service, and, therefore, his office would be closing in the immediate future.

132. That June 2, 2014 letter was Mrs. Godlewski's first indication that Muskey had stolen her money.

133. In or around the late spring months of 2014, Muskey ceased making $500.00 monthly payments to Mrs. Godlewski.

134. Upon information and belief, the total monthly payments that Muskey made to Mrs. Godlewski does not represent the full, principal amount of her original investment.

135. Upon information and belief, Muskey failed to repay at least $5,000.00 to Mrs. Godlewski.

136. Mrs. Godlewski's $5,000.00 has yet to be repaid to her.

### Mrs. Muskey

137. Mrs. Muskey is Muskey's mother and Muskey served as her financial and investment adviser between 2006 and 2014.

138.  While he was her adviser and through a series of fraudulent actions, Muskey stole from or caused Mrs. Muskey to lose $190,233.58.

139.  In or around December 6, 2006, Muskey advised and encouraged Mrs. Muskey to invest money with American Funds mutual funds.  Mrs. Muskey gave Muskey two checks, one in the amount of $29,753.83 and one in the amount of $5,000.00 for purposes of investing the money with American Funds.

140.  On or about May 2, 2007, Muskey encouraged Mrs. Muskey to withdraw certain proceeds from her American Funds account and allow Muskey to "reinvest" those monies in other financial products.  Mrs. Muskey permitted Muskey to withdraw $10,000.00 from her American Funds account, which she received in four (4) equal installments of $2,500.00.  Mrs. Muskey deposited all four (4) checks into her personal bank account, and then wrote a personal check payable to Muskey, on May 9, 2007, in the amount of $10,000.00.  The money was designated and intended to be used for investment purposes.

141.  Upon information and belief, Muskey did not invest or "reinvest" any of Mrs. Muskey's money, but instead used the money for his personal benefit.

142.  On or about May 24, 2007, Muskey encouraged Mrs. Muskey to withdraw more from her American Funds account and allow Muskey to "reinvest" those monies in other financial products.  Mrs. Muskey permitted Muskey to withdraw $8,993.32 from her American Funds account, which Mrs. Muskey then deposited into her personal bank account, only to then write a June 5, 2007

personal check in the amount of $9,000.00 payable to Muskey that was designated for investment purposes.

143.   Upon information and belief, Muskey did not "reinvest" Mrs. Muskey's $9,000.00, but instead used the money for his personal benefit.

144.   On or about September 20, 2007, Muskey encouraged Mrs. Muskey to withdraw more from her American Funds account and allow Muskey to "reinvest" those monies in other financial products.   Mrs. Muskey permitted Muskey to withdraw $16,500.00 from her American Funds account, which Mrs. Muskey then deposited into her personal bank account, only to then write a September 28, 2007 personal check in the amount of $16,500.00 payable to Muskey that was designated for investment purposes.

145.   Upon information and belief, Muskey did not "reinvest" Mrs. Muskey's $16,500.00, but instead used the money for his personal benefit.

146.   As of July 11, 2007, Mrs. Muskey maintained Union Central Life Insurance investment account # A00000367L that had a balance of $106,626.73. Muskey was her adviser at this time.

147.   On or around July 11, 2007, Muskey arranged and accomplished a cash withdrawal or surrender, in the amount of $21,500.00, from Mrs. Muskey's Union Central Life Insurance account.   Muskey, without Mrs. Muskey's permission, ordered the funds to be wire transferred into a PNC Bank account that

Muskey controlled.   After withdrawal penalties were assessed, this transaction resulted in Mrs. Muskey experiencing a total loss of $22,661.47.

148.   On or around November 21, 2007, Muskey arranged and accomplished another cash withdrawal or surrender from Mrs. Muskey's Union Central Life Insurance account.   Muskey forged Mrs. Muskey's signature and used her social security number to effect this withdrawal.   Upon information and belief, and unbeknownst to Mrs. Muskey, Muskey received these proceeds by either check or wire transfer and used same for his personal benefit.   After withdrawal penalties were assessed, this fraudulent transaction resulted in a $10,815.12 loss to Mrs. Muskey.

149.   On or around January 21, 2008, Muskey arranged and accomplished another cash withdrawal or surrender from Mrs. Muskey's Union Central Life Insurance account.   Muskey forged Mrs. Muskey's signature and used her social security number to effect this withdrawal.   Upon information and belief, and unbeknownst to Mrs. Muskey, Muskey received these proceeds by either check or wire transfer and used same for his personal benefit.   After withdrawal penalties were assessed, this fraudulent transaction resulted in a $60,343.59 loss to Mrs. Muskey.

150.   Eventually, the remaining portions of Union Central Life Insurance account # A00000367L were depleted by Muskey and used for his personal

benefit, leaving Mrs. Muskey with a balance of $0 in Union Central Life Insurance account # A00000367L.

151.   On or about November 2, 2006, Mrs. Muskey received a $25,106.85 death benefit when her husband passed away.  In or around 2007, the full amount was placed with Muskey for investment.

152.   Upon information and belief, Muskey did not invest Mrs. Muskey's $25,106.85 death benefit proceeds, but instead used the money for his personal benefit.

153.   On or about July 11, 2007, Mrs. Muskey purchased and opened a life insurance account with Union Central Life Insurance, with an original account balance of $23,000.00.  That account number was # X060000721.

154.   On or about July 11, 2007, Muskey forged Mrs. Muskey's signature and wrongly used her social security number to take out a loan in the amount of $18,514.00, using Mrs. Muskey's Union Central Life Insurance account # X060000721 as collateral for the loan.  The loan was not repaid.

155.   During the time Muskey was systematically stealing money from Mrs. Muskey's investment accounts, Muskey sent Mrs. Muskey phony quarterly statements purporting to describe the condition of her investments.

156.   Mrs. Muskey did not know the quarterly statements were phony when she received and viewed them.

157. The quarterly statements appeared on Defendant's letterhead, and Defendant was listed on each statement as Muskey's supervising and responsible broker/dealer.

158. On or about June 2, 2014, Mrs. Muskey received a letter from Muskey indicating that Muskey is under investigation by and cooperating with the United States Secret Service, and, therefore, his office would be closing in the immediate future.

159. No portion of Mrs. Muskey's stolen money has been returned to her.

## COUNT I
### SECURITIES FRAUD PURSUANT TO SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5

160. Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

161. Defendant is/was a seller of securities under 15 U.S.C. §§78a, et seq. (the "Act") and 17 C.F.R. § 240.10b–5 (the "Rule").

162. Plaintiffs are/were purchasers of securities under the Act and the Rule.

163. As set forth in detail above, Plaintiffs purchased securities from Defendant, through Defendant's authorized agent.

164. The financial products Plaintiffs purchased are securities as defined at 15 U.S.C. § 78c.

165. As set forth in detail above, Defendant fraudulently induced Plaintiffs to purchase securities through misrepresentations and nondisclosure of material

facts.   Specifically, Defendant's agent falsely promised Plaintifss their money would be kept safe and that it would generate a steady return or increase, and Defendant's agent failed to disclose to Plaintiffs the fact that he was engaged in a Ponzi scheme and that he was systematically stealing money from clients.

166.   As set forth in detail above, Plaintiffs justifiably relied on these misrepresentations and nondisclosure of material facts.

167.   Defendant made these misrepresentations, through its authorized agent, and Defendant failed to disclose material facts that directly and proximately resulted in, inter alia, Plaintiffs' purchase of securities from Defendant.

168.   As set forth in detail above, Defendant acted at all material times through their authorized agent, Muskey.

169.   As set forth in detail above, Defendant, through its authorized agent, made false and misleading statements and material omissions that Defendant knew, should have known, or was reckless in not knowing were relied on by Plaintiffs to induce their purchase of securities.

170.   As set forth in detail above, Defendant, directly and indirectly, intentionally, willfully and recklessly, by use of a means and instrumentality of interstate commerce and the mails and phone lines, used and employed in connection with the sales of securities, manipulative and deceptive devices and contrivances to defraud Plaintiffs; they engaged in acts and practices in the course of a business that operated to defraud Plaintiffs and others; and Defendant

27

intentionally or recklessly omitted to disclose the material facts necessary to fully advise Plaintiffs about their investments, all in order to induce the sale of securities.

171.   Defendant and others engaged in a common plan, scheme and unlawful course of conduct in which they knowingly or recklessly engaged in acts. Practices and courses of business that operated as a fraud and deceit upon Plaintiffs and made various deceptive and untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs.   The purpose and effect of the scheme was to induce Plaintiffs to purchase Defendant's securities.

172.   Defendant knew and intended Plaintiffs to rely upon the false misrepresentations and material omissions set forth in detail above.

173.   Plaintiffs   justifiably   relied   upon   Defendant's   fraudulent misrepresentations and omissions of material facts in purchasing securities.

174.   Defendant's misconduct violates the Act and the Rule, and Plaintiffs have suffered damage to their business and property, as a direct and proximate result of Defendant's misconduct.

## COUNT II
## VIOLATIONS OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (UTPCPA)

175. Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

176. Plaintiffs are "persons" within the meaning of the UTPCPA, and as defined by 73 P.S. § 201-2(2).

177. The conduct described above took place in the Commonwealth of Pennsylvania.

178. The foregoing actions of Defendants, as described in detail above, constitute unfair and deceptive acts and practices in the conduct of trade or commerce that are unethical, unscrupulous, offensive to public policy, and in direct violation of the UTPCPA.

179. Plaintiffs were purchasers of commercial services, specifically of investment advisory services from Defendant.

180. Defendant, through its agent, employed unfair or deceptive acts or practices within the meaning of 73 Pa. C.S.A. §§ 201-2 and 201-3. Such unfair or deceptive acts or practices include: (a) false representations and material nondisclosures as to the fate, potential and condition of Plaintiffs' investments; (b) false representations and material nondisclosures as to the quarterly status of Plaintiffs' investments; (c) false representations and material nondisclosures as to the performance of Plaintiffs' investments; (d) false representations and material

nondisclosures as to the investment philosophy, operations and objectives of Defendant.

181.   The misrepresentations, omissions, deceptions and unfair conduct of Defendant, through its agent, were likely to deceive Plaintiffs and cause them to misunderstand the nature of their investments and the potential for total loss of their money.

182.   Defendant, through its agent, intended Plaintiffs to rely on its misrepresentations, omissions, deceptions and unfair conduct.

183.   Defendant's actions, committed through its agent, of stealing Plaintiffs' money constitute a fraud in the transaction for the sale of securities.

184.   As a direct and proximate result of Defendants' unfair and deceptive acts, Plaintiffs have suffered damage to their business and property.

## COUNT III
## BREACH OF FIDUCIARY DUTIES

185.   Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

186.   Defendant owed fiduciary duties of loyalty, due care, independence, candor, good faith, and fair dealing to Plaintiffs.

187.   Defendant owed Plaintiffs a duty to maximize, and not to undermine, subvert, convert, squander, steal, and dissipate Plaintiffs' investments.

188.  Defendant owed Plaintiffs a duty to not deal with them in an unfair, dishonest, or otherwise improper manner.

189.  Defendant breached its foregoing fiduciary duties to Plaintiffs by intentionally and recklessly misleading them, and by stealing their money.

190.  As a direct and proximate result of Defendant's breaches of fiduciary duties, as described above, Plaintiffs have suffered damage to their business and property.

**WHEREFORE**, Plaintiffs Anthony Delfino, Ronald Godlewski, Stanley Saffron, Millie Godlewski and Lynn Muskey respectfully request that this Court enter judgment against Defendants Ameritas Life Insurance Corporation and Ameritas Investment Corporation, and in favor of Plaintiffs, in the form of compensatory damages, non-economic damages, treble damages and punitive damages, where appropriate, together with interest (including prejudgment interest), costs of prosecuting this law suit, reasonable attorneys' fees, and such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff hereby respectfully demands a jury trial pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(a).

s/Lawrence J. Moran, Jr.

John G. Dean
Joseph J. Joyce, III
Lawrence J. Moran, Jr.
**ELLIOTT GREENLEAF & DEAN**
201 Penn Ave., Suite 202
Scranton, PA 18503
(570) 346-7569

*Attorneys for Plaintiffs Anthony Delfino, Ronald Godlewski, Stanley Saffron, Millie Godlewski and Lynn Muskey*

DATED:  November 14, 2014

## CERTIFICATE OF SERVICE

I, Lawrence J. Moran, Jr., hereby certify that I have caused to be served this day a true and correct copy of the foregoing Complaint via ECF to counsel of record or via certified U.S. mail and/or personal service, in accordance with the Federal Rules of Civil Procedure addressed as follows:

**AMERITAS LIFE INSURANCE  CORPORATION**
**5900 O Street**
**P.O. Box 5507**
**Lincoln, NE 68505**

**AMERITAS INVESTMENT CORPORATION**
**5900 O Street**
**P.O. Box 5507**
**Lincoln, NE 68505**

s/Lawrence J. Moran, Jr.
Lawrence J. Moran, Jr., Esquire

DATED:  November 14, 2014